and Seng v. DeVries, 22-277. Good afternoon, Your Honors, and may it please the Court, Matthew Guiney from Wolf Haldenstein for the appellants. Your Honors, this appeal rests on three basic observations. First, the Securities Act of 1933 and case law interpreting it in this circuit requires the disclosure of all facts necessary to make statements and offering documents not misleading and to allow investors to accurately assess the risk of investing in those securities. Second, the monopolistic regulator of tobacco products in China prior to the IPO at issue here had repeatedly stated its intent to regulate e-cigarettes as tobacco products. And third, those specific regulatory warnings that were issued prior to the IPO were not disclosed in the offering documents here. Consequently, investors were not afforded the ability to accurately assess... Would you explain to me how, and I understand I think what's referred to as the Great Firewall and so on, but how those three prior statements from the regulator were not public in a meaningful way to investors worldwide? Sure, Your Honor. I think there's two parts to that. I don't know if Your Honor wants me to talk about the newspaper articles talking about them or the regulatory warnings themselves. Question stands. Do you answer the way you think is best for your client? Very good, Your Honor. So the first point I'd make about the regulatory warnings themselves is they were never published in English, ever. To the best of my knowledge, the first time those warnings were ever published in English were after our investigator investigated in China and translated those documents for our omitted complaint. I have never seen a copy of those regulatory warnings published in English ever before. Number two, at least when I tried, and we have this in our complaint, anybody from the U.S., at least from my office or from my home, when you try to actually access those websites, there's a firewall. It's a danger. You're trying to access something that is not as dangerous. You should watch out. Number three... So it's a breachable firewall. It's a fire warning. Yes, Your Honor, Judge Robinson, yes. I mean, our investigator was ultimately able to access them, and I honestly don't know whether that was in the United States or in China. But certainly a breachable firewall comes up. Number three, I think it's important to note that the district court itself observed that the regulatory warnings were, quote, unquote, obscure. And Judge LaHier, to your other point, when looking at whether warnings were obscure or accessible, I think it's really important to look at the difference between accessibility from the U.S. investor perspective and accessibility from the defendant issuer's perspective here. We've argued in our complaint and in our briefs here that RLX, the defendant, was acutely and keenly aware of what the State Tobacco Monopoly Authority said and did. They regularly cite pronouncements, warnings. They follow pronouncements and warnings on a regular basis. It's a Chinese company, and we're talking about a pronouncement from the 800-pound gorilla, so to speak, the regulator that is charged with monopolistic oversight over tobacco products. So can I ask a question about the actual impression that they had or should have had on the basis of these statements? I get the 2017 and 2018 statements that suggest an intent without a timeline to try to fold in e-cigarettes into the regulation of tobacco, which would imply the monopoly system. I'm struck, and I'm thinking maybe I'm missing something, that the more recent disclosure or statement prior to the issuance here was in 92919. And in that, I don't find such a statement. And in fact, by contrast, I do find an express statement that they intend to regulate heated cigarettes, whatever those may be, as tobacco. But there's no comparable statement as to e-cigarettes that I found. And instead, they say, we're doing research on e-cigarettes. And they start talking about what different countries around the world are doing. And they say, at present, we are studying the regulatory ideas and main measures in major countries with a view to better implementing the regulatory requirements put forward by the conference at the convention in the future. So my question is, as of 2019, are they really on notice that there is a plan to actually regulate as a tobacco product within the monopoly framework? Sure, Judge Robinson. Let me answer that in two ways. Number one, I think I'd go back to my main point. Well, let me back up. I think as to the September 29, 2019, warning, I would point, Your Honor and the Court, to the following sentence. We will continue to, quote, actively promote the introduction of control measures for new tobacco products such as electronic cigarettes. That is, I think, the salient point from the 2019 announcement itself. But that doesn't mean regulate them as a monopoly. That just means continuing to look at other sorts of regulatory measures, right? Well, I think it's important to keep what the STMA is saying in the context of what the STMA is. The STMA is the entity that is charged with monopolistic oversight over tobacco in China. The STMA regulates tobacco products. The STMA and its sister entity, China Tobacco, make all the cigarettes. They set the tax rates. They control the entire industry top to bottom. So, Judge Robinson, I think when, in September 2019, when the STMA says they will actively promote, active promotion of control measures for new tobacco products such as electronic cigarettes. But even if that's- I'm sorry, but what do you mean by that? Finish that sentence. They say that. And what are you saying that it had to be interpreted to mean? Well, I think- That it was going to be brought into the state monopoly? Well, Your Honor, in March of 2021, the draft regulations are going to come out. Well, I know. 2020 hindsight. I'm just asking you that statement about we will continue to communicate and coordinate closely with relevant departments. You know, a whole word salad there. It contrasts, as Judge Robinson observed, quite starkly with what they said about heated tobacco products, which there they said we explicitly bring them into the scope of monopoly management. But with respect to e-cigarettes, they have this whole gobbledygook paragraph saying we're looking, we're thinking, we're debating, we're going to do stuff. That's vague by comparison. Your Honor, I think the point is, even if that one is vague, and we submit that, because what ultimately happened in March of 2021 is there's a single sentence. The draft regulations are not long. They're not complicated. The draft regulations that come out in March 2021 are a single sentence, and it's basically e-cigarettes shall be regulated as tobacco products. That's it. So I think there's the way we've looked at this and the way I think these replies can. You can't interpret what happened before in light of what happened after, right? Well, Your Honor, I think even if you go back to 2017 and 2018, and certainly 2018 I think is our strongest point, which is tobacco products shall be managed as, sorry, electronic cigarettes shall be managed as tobacco products. That is the monopolistic regulator saying precisely what it ultimately did in March of 2021 when it issued the draft regulations and precisely what it did in November of 2021 when those final regulations were issued. We will regulate e-cigarettes as tobacco products, full stop. And the problem here is that that information is nowhere to be found in the offering documents. The offering documents instead present the risk of regulation as completely hypothetical. In fact, the offering documents say that the offeror can't promise that the government won't regulate these e-cigarettes as tobacco products. So is it that they failed to disclose the level of risk as opposed to the existence of risk? Yes, Your Honor, and I think if we look at page one of the district court's opinion, Your Honor, the district court got that part right. The complaint alleges that the offering documents failed to disclose the likelihood of forthcoming enhanced regulations of e-cigarettes. The cases we cite from this circuit. So you're relying on the 2018 reply or the statement, Judge Robinson, that you're relying on three. I understand that. But your best, as you pointed out, was 2018. In answer to Judge Robinson's questions, you point out one line at the very end of the 2019 statement from the Chinese agency. But that appears to be less forceful and somewhat of a retreat. Maybe a fair reading from the more forceful statement made in 2018. And if that's true, and you also mentioned or used or referenced obscurity, if that's true, and are Alexis reading these things, it could plausibly be that as a retreat because it's not saying we are going to. Then I'm having trouble understanding how, what to make of the 2019 statement and why that's not a reason for disclosing a substantially less level or less of a degree of risk than you would have wanted. Sure, Judge O'Leary. I would say this. Even the district court conceded or acknowledged that the regulatory warnings fairly indicate a trend towards greater regulation. I think that's what the district court found. And I think our main argument is that the offering documents disclose no trend whatsoever. The offering documents, it is as if these regulatory warnings never existed. If an investor were to read the offering documents, they would have no idea that the STMA had said anything at all about an intent to regulate this product. An investor reading these hundreds of pages of disclosures will look and say, it's possible. Again, if you look at our reply brief, it's possible that a volcano may erupt. That in and of itself may be a true statement. But if there are seismic warnings, if there are other facts on the ground that exist at the time of the offering, to simply say that something may or may not happen, that's not the law in this circuit. Christie in Asia- Is there any circumstance under which an agency, the US, China, wherever, malls a change in the regulatory framework and that that does not need to be disclosed? Certainly, Your Honor. And I think we can take the Green Lane case that the district court looked at and analogized. In Green Lane, we're talking about a regulation that San Francisco proposed. There, from a size perspective, it was immaterial. Or even the FDA. Let's take the example the FDA may be mauling something. The difference is, in China, the STMA, the regulatory entity that made these pronouncements, is the monopolistic overseer of this product. And by the way, this product is 62% of China's market. And e-cigarettes is virtually 100% of RLX's business. So we're not talking about some random little entity that may have trouble implementing a law. We're talking about the monopolistic regulator who regulates potentially 100% of RLX's business line, saying, at the very least, in October of 2018, that this product shall be managed as tobacco products. But we have offering documents that literally just say, it could happen, it might not happen. Can I ask you about that? Because I read the offering document to suggest a trend. And I'm looking at page 176, where they say that changes in existing laws, regulations, and policies, in relation to the e-vapor industry, have materially and adversely affected, and may further materially and adversely affect our business operations. So I didn't read that as saying, look, maybe a volcano will go off, whatever, who knows. I read that as saying, look, we live next to a volcano. It's gone off before. We've been buried in mud. This thing might go off again. That's different from saying, we have been materially and adversely affected by regulations, and it may happen again. That suggests to me, at least it suggests that this is a real risk, not a hypothetical thing that, you know, we could get hit by an asteroid. Judge Nardini, it may very well be a real risk, but there are facts on the ground that existed at the time. And the fact, the paragraph that you just read, says nothing about the STMA's explicit, stated goal. No, that I understand. You're saying that if there were particular facts pointing to the trend, they needed to disclose them. But I thought you were also making the suggestion that this was like one of the volcano paragraphs, that it was just a completely abstract thing that no one would ever think, from reading it, was grounded in a reasonable likelihood of ever happening. Whereas, by contrast, what it says is, this has happened already, and it may happen again. That's different. I'm not going to argue that point, Your Honor, but I do think that our point is... Feel free to argue. Well, respectfully, our point is that these specific facts on the ground were not disclosed. I'd also note that with respect to trends, I did a word search in the offering documents. That word shows up seven times, and only two of them actually have anything to do with a trend at all. And I'll just read it to Your Honors. The only thing the offering documents say about a trend is as follows. Key industry trends. According to the CIC report, the following key trends continually influence China's e-vapor industry. One, heightened focus on ethics and social responsibility. And two, continued advancement in science. So, again, maybe that's back to Judge Nardini, your point. But I don't see... There is a specific section in the offering documents, that's at A280, that talks about key industry trends. There is no mention of... Forget about a global increase in potential regulation of VT. Let me go back to accessing information and the information wall. So, as I understand it, both the New York Times and the Wall Street Journal were able to access this information about... Well, they reported information about these cigarettes and the regulation. Can you explain that to me? Yes, Your Honor. I didn't mean to shake my head before you finished your question. But that is a no. It was meant as a no. There are two newspaper articles that the defendants submitted in connection with the materiality issue here, basically arguing, hey, the market knew what was going on here, and it was widely reported in the newspapers. They were both dated in 2019 on the same day. They follow the announcement by the STMA that e-cigarette companies should stop selling online. And the articles report that that was a more widely circulated story by the STMA, stop selling electronic products online. And so the two documents say the following. One of them says, quote, the e-cigarette business is, quote, increasingly under siege. That paragraph is actually about the United States. If you read it in context, it actually is talking about the United States market. And the other paragraph, the other article does say, quote, the STMA started drafting national standards for the vaping industry in October 2017. That is it. The articles do not say anything about the STMA warnings at all. The authors of those articles do not, to the best of my knowledge, do not access the actual regulatory warnings at all. The only thing, the only impetus for those articles was a separate announcement. And so that is it. And by the way, the article that says, quote, the STMA started drafting national standards for the vaping industry in October 2017, that says far more about the state of affairs than the authoring documents does. That's a very specific warning. But so the case law, I think, is clear that to charge investors with a single line in a single newspaper article a year and a half before the IPO, to say that investors are supposed to be on notice of all these things that we've talked about because one line in one newspaper article mentioned it, I don't think the law stands for that proposition in this circuit or in others. The authoring documents are supposed to present all the material information. At least for my part in the housekeeping matter. So I take it you're not challenging the dismissal of the Section 12 thing. Is that correct? That's correct, Your Honor. Thank you very much. We'll hear from your friend on the other side. May it please the Court, Michael Griffin for defendants, appellees. Judge Eggemeyer correctly dismissed this case because the offering documents did disclose all of the existing regulations that were actually in effect at the time of the IPO, the uncertainty surrounding what the government might do in the future, and warned that what it had done and what it could do could materially and adversely affect the company. That was disclosed in the offering documents. Now, none of that was... The question is the degree of risk and uncertainty, not the fact of risk or uncertainty. Yes, Judge Loy, I agree. And as Judge Eggemeyer himself acknowledged. Correct. I think we all agree on that, that that is the issue here. But companies are not in the business of, and securities laws don't require companies to prognosticate, to speculate about the likelihood that regulators are going to institute regulation X or Y absent some specific proposal. And that's really the difference in the cases here. Can I ask, though, at least under Stratton-McClure, which I realize was a 303, but I'm applying it by analysis because of the 5D, the language there. If there's a trend, and the trend sort of identified increasing regulation of the Chinese government, if you can determine that it's not reasonably likely to occur, no disclosure required, I'm sure that's not the situation here. If you can't make that determination, you have to objectively evaluate the consequences of the known trend and then disclose them. Did that happen here? It did not happen here because there was no specific proposed regulation to analyze the potential effects of. Well, there was a trend, right? So there was a trend, and the consequence of the trend that would be of worry, I mean, I suppose the ultimate consequence would be a nationwide ban on e-cigarettes, but the monopoly regulation would be the penultimate ultimate consequence. Don't you have to, knowing that there's a trend in that direction, don't you have an obligation to evaluate and disclose? You can disclose it by saying, we don't know whether it's going to happen, but this thing is a potential outcome of a trend, and we can't rule it out. Isn't that what Stratton-McClure requires? Respectfully, Judge Robinson, no, I don't think it does. The securities laws and Stratton-McClure don't require companies to predict trends. They require them to disclose existing trends, and as Judge Nardini pointed out, the company did that here at page 176 of the record reflecting the offering documents. And your question actually gets to the problem with that type of an analysis. No one knows where the regulations are going. Maybe it stops at monopolization. Maybe it goes all the way to outright prohibition. Which possible future regulation are the companies supposed to analyze the effect of and disclose? There's no way for a company to know that. So what did we mean in Stratton-McClure when we said, here's the two assessments you have to make. One is, is the known trend, and I'm cutting out in the middle of the sentence, likely to come to fruition? Isn't that question exactly about predicting, not what's the trend as we see it now, but is it likely to lead where we're afraid it might? It depends on the trend, I think. And it depends on the context of the trend. And when you're talking about increasing regulation, that type of analysis simply doesn't make sense because there's no way to know where that trend could ultimately terminate. If you're talking about something different, like, for example, the trend in increasing popularity of e-cigarettes versus decreasing popularity of traditional cigarettes. That's something that a company could look at and predict. Let's say we completely overtake traditional cigarettes, the way streaming completely overtook DVDs. What would the impact of that be on our company? That's something that you can conduct that type of analysis for. You simply can't do that when you're talking about what are all the conceivable ways under the sun that a regulator could choose to regulate an industry when they haven't even suggested which way they're going to potentially regulate it. Well, they have, right? I mean, in 2017 and 2018, they specifically said, we shall regulate e-cigarettes as tobacco products. I agree that they backed away from that in 2019, which creates a problem. But it's not as though this is a mysterious possible outcome. It's kind of the most likely nuclear option that's sort of out there. Respectfully, Judge Robinson, I disagree. Because I think the uncertainty goes back even to the 2018 reply, before you even get to 2019. Obviously, the reply says that heated tobacco, electronic cigarettes, and these other products shall be managed as tobacco products. The question becomes, what does that mean? What does it mean to say they shall be managed as tobacco products? Now, the appellants argued that that must mean monopoly regulation, right, the way traditional cigarettes are regulated. But that's not supported by the 2018 reply itself. Because if that's what it meant, they could have just stopped there. But the 2018 reply doesn't stop there. It goes through one paragraph, and it talks about heated tobacco. And it says, heated tobacco, we've issued, the language is, excuse me, the clear supervision opinions that these will be regulated in accordance with various supervision regulations of traditional cigarettes. That's in 2018. And it doesn't say that for e-cigarettes. The following paragraph simply says, we are looking into it. We are, quote, waiting for further instructions from relevant departments. No hint of what instructions. No hint of what relevant departments it's waiting to hear from about e-cigarettes. There's no suggestion of monopoly, even in 2018. But if there was any doubt, as Your Honor pointed out earlier, the 2019 is explicit. The 2019 reply explicitly says, it actually uses the word explicit, right, quote, we explicitly bring heated tobacco products into the scope of monopoly management. That's at Appendix 67. And it does not say that for e-cigarettes. For e-cigarettes, it says, we are continuing to look at how this is regulated around the world. Some countries have an outright prohibition. Some treat it as a tobacco product. Some treat it as a medical product. Some treat it as an electronic product, just a consumer good. And we're still continuing to evaluate this. And that's in 2019. And notably, that's still more than a year before the IPO, which is in January of 2021. And in that year, there's no further development. There are no additional statements by the STMA. There are no proposed regulations. There is no mention of a potential monopoly over e-cigarettes. And the question for RLX is, in January 2021, at the time of the IPO, what was the trend then? What were the uncertainties then? And that's what the company was looking at. And that's what they disclosed here. Now, Judge Loya, you mentioned or brought up the issue of whether these replies were public. As Judge Engelmeyer pointed out, they are inherently public statements. These were reports by the STMA to the Chinese Congress. And they were not buried in some obscure records database. They're on the regulator's website. The plaintiffs actually cite these in their complaints. If you look, for example, at Appendix 26 in footnote 5, they have the links to where these replies came from. It's tobacco.gov. The U.S. capital markets attract the most sophisticated investors in the world. They know they're investing in a Chinese company. They know it's an evolving and emerging industry that's highly regulated. Investors are certainly motivated to go to the regulators. Highly regulated is a misnomer. Fair enough. Highly scrutinized, perhaps, at the time of the IPO. All this is to say it's not a big leap to say, hey, let's go to the Chinese regulators' website and see what public comments they have posted on their own website about this issue. And that's what Judge Engelmeyer held. But that's a completely independent basis after whether or not there was a disclosure violation in the first place or a material misstatement. The disclosures that were made in the offering documents were perfectly consistent with what was in even the STMA replies. The 2019 STMA reply states, quote, at present, there are no specific supervision system and effective measures for electronic cigarettes in China. That's at Appendix 66. The offering documents disclosed almost the exact same thing. Quote, in China, there are currently no clear and specific national laws, regulations, rules, or standards for the sales of e-cigarettes. So, again, I would just go back to I don't know that the argument is about the actual actuality. It's about the degree of risk. So that's what I'm very focused on. And I take it that the argument is that that was not disclosed. So risk, sure. I mean, every investment is potentially risky. Degree of risk, particularly in a monopolistic regime, is something totally different. Agreed, Your Honor. But in the context of the IPO in January 2021, when there's been radio silence from this regulator for more than a year, and the last thing you heard from the regulator is simply that they're looking into it, they haven't proposed any specific regulations or announced any particular timeline, there's nothing more the company could say at that point than this may occur. To have said anything stronger would have been at risk of misleading. I mean, imagine the company had IPO'd in 2018 after that 2018 reply and said it's likely that it's going to be regulated as a monopoly. Where did they say this may occur? On 176? You're saying we can't rule out that it may occur? Is that the same as saying it may occur? Correct, Your Honor. I think there are various disclosures that speak to the uncertainty. They warn that there could be more stringent laws. Right? Quote, government authorities in China may impose more stringent laws, regulations, and policies. That the issuance of new laws, regulations, and policies could have a materially adverse effect. We cannot assure you that the government will not impose further restrictions. It is uncertain how government authorities will regulate e-vapor products. There can be no assurance that the regulatory regime will be favorable to e-vapor products in general and to us. Right? And these are all at 176 to 177 and 179 of the appendix. So respectfully, Judge Robinson, we would submit that there were ample warnings that this may occur. And there were no facts on the ground that indicated any greater likelihood. Thank you. Thank you. We'll hear from the appellant's counsel. Just two brief points, Your Honor. Just to respond to my friend's point, I think my friend just said there's nothing more that could have been disclosed in the offering documents. But I think, I would not be standing here today if the offering documents disclosed that in September of 2017, the monopolistic regulator said it was actively studying and formulating a feasible scheme to strengthen tobacco e-cigarettes. I would not be standing here if the offering documents said on October 16, 2018, the STMA said what it said. And we've been through it before. Another point I'd like to make, Your Honors, is we've talked about what precisely the regulatory warnings say. We're parsing the level of risk and parsing exactly what it says. But I think it's hard to read those in a vacuum. I mean, let's look at what ultimately happens eight weeks after the IPO. Is the STMA does, I think, exactly what it said it would do. The draft warning, the draft regulations is one sentence. New tobacco products, such as electronic cigarettes, shall be implemented with reference to the relevant provisions on cigarettes in these regulations. That's it. And so to try to read something different, I mean, I think it's fair to look at those pronouncements and say, well, look what ultimately happened two months later. So to try to say, divorce what those regulatory warnings say from what ultimately comes out. In their hands. I mean, we can't look at what happened later and say, oh, something that was vague before is now clear to us. It has to be clear on its own two feet or it's not clear. And I understand your argument that it sends a clear message. But I don't see how we can take later occurring facts to sort of either confirm or deny our reading of something that happened before. We have to take the information as it stood at the time of the orphan. We're certainly not asking the defendants to predict the future. But what is required is to say these are the facts that existed. And so to my initial point, the orphan documents clearly could have said those things. The offering documents could have said there's a heightened risk profile. The offering documents could have said there is an observable trend towards greater regulation. And respectfully, we don't think that happened. And one final point. When these regulations are announced, RLX stock drops almost 50%. Hundreds of millions of dollars are wiped off the market cap. And so, again, I think that goes to, you know, what are these offering documents fairly worn of? You know, if the whole world was aware of this increasing trend towards that e-cigarettes were going to be treated as tobacco products, the market was shocked. Hundreds of millions of dollars of investor money is gone in an instant. And I think, you know, the district court really read that point against us. The district court actually said that as it comes to the market reaction, the district court said that it shows that it's all the more plausible that RLX did not anticipate the regulations either. But from a materiality point of view, that has it completely backwards. The question is, what did the market know? And what the stock drop shows is that the market was caught by surprise by what was disclosed. And it also reads the complaint in the light most favorable. So I just want to confirm one thing with respect to this firewall. You said that it's a breachable firewall. Educate me. So if I went and tried to access this information about the STMA, about whatever other monopolistic agency exists in China, I would be warned that what? What would I see and how could I get past that? So I'll couch my comments with the fact that I'm a lawyer and not a tech expert. So we share that. From a purely personal point of view, and again, this is a footnote in our complaint. So I think it's germane. Even when I tried to access, the website is tobacco.cn. I think that's the country code. It's not .gov, it's .cn. I think that's the Chinese country code. But you get one of those warnings that says, you know, warning, you're trying to access some information that is potentially dangerous or outside of the country. So that's the. Now, I don't get that. Yes, Your Honor. I don't. Presumably any time you look at stuff in China, you're going to get that warning? And if you're researching tobacco regulation in China, that would shock you? No, Your Honor. Well, no, Your Honor. We were able to access some pages. But these particular pages, once our investigator said, look at these warnings that we found, and here are the webpages where they are located, when we actually tried to access them, we were not able to do so due to the firewall. But I think it's important. You know, my friend made a point that, you know, investors are free to go, you know, look this stuff up. But, you know, investors are not charged with going and finding information about the securities office. That's the point of the offering documents. Again, if something is readily accessible online or in the public domain, then they are sort of charged with that, right, as a matter of the materiality analysis. Your Honors, there was no English translation of any of this information, by the way. But if you were going to invest in a Chinese company or it could be some other company from some other country, the fact that you don't understand the language is not, I think, an excuse for not being able to access the information that's publicly available to everyone in that country. Well, I'd say two things to that. Number one, Your Honor, I think it is outcome determinative. I think there are plenty of cases in our materiality section that talk about whether articles, and this had to do with the newspaper article context, but whether those reports were in foreign languages or not. I think that's very outcome determinative. And number two, RLX, let's not forget, RLX was registering on the New York Stock Exchange. And so to charge investors with, I don't know, having to learn Chinese to root out information that is not easily accessible and not in the language, and to my knowledge has never been published in English. So that's a new, this is sort of a new or novel issue, right? And I don't think that we've got any opinions on that issue. I'm not aware of any, as I stand here. No, I'm not aware of an opinion with respect to that specific set of facts, Your Honor. Well, thank you very much. We'll reserve the decision. Thank you, Your Honor.